***********
Upon review of the competent evidence of record, including the briefs and oral arguments of the parties with reference to the errors assigned, and finding no good grounds to receive further evidence, or to rehear the parties or their representatives, the Full Commission, upon reconsideration of the evidence, reverses the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which the parties entered into in their Pre-Trial Agreement and at the hearing as:
 STIPULATIONS *Page 2 
1. Plaintiff is Joan K. Newnam and was 57 years old on the date of the hearing before the Deputy Commissioner.
2. Defendant is New Hanover Regional Medical Center, a self-insured hospital located in Wilmington, North Carolina.
3. Allied Claims Administration was the servicing agent of Defendant, which was self-insured on August 20, 2007.
4. Defendant regularly employs three or more employees and is bound by the North Carolina Workers' Compensation Act. An employment relationship existed between the parties on August 20, 2007.
5. Plaintiff's workers' compensation claim is for bilateral carpal tunnel syndrome, which she alleges is an occupational disease contracted in the course and scope of her employment. Defendant denied the compensability of Plaintiff's claim.
6. Plaintiff's compensation rate is $754.00, which is the maximum compensation rate for the year 2007.
7. Plaintiff and Defendant are parties to three other active workers' compensation claims before the North Carolina Industrial Commission — I.C. file numbers 418442, 886198, and 994533, none of which is the subject of these proceedings. Defendant accepted the compensability of North Carolina Industrial Commission file number 418442 via Form 60s dated March 31, 2004, April 7, 2004, and June 18, 2004. Defendant accepted the compensability of North Carolina Industrial Commission file number 886198 via a Form 63 dated October 19, 2008. Defendant denied the compensability of North Carolina Industrial Commission file number 994533 via a Form 61 dated July 28, 2008. Plaintiff received medical and/or indemnity benefits related to all three of these workers' compensation claims. *Page 3 
8. Mediation was unsuccessful in this matter, and Defendant paid/will pay the entire mediation fee pursuant to Rule 7(c) of the North Carolina Industrial Commission Rules for Mediated Settlement and Neutral Evaluation Conferences.
9. The parties stipulated to the following documents being admitted into evidence as stipulated exhibits:
 a. Stipulated Exhibit 1 — Executed Pre-Trial Agreement;
 b. Stipulated Exhibit 2 — "Criteria-Based Job Description and Performance Standards New Hanover Regional Medical Center" forms for Magnetic Resonance Imaging Technologist position dated July 22, 1993, January 24, 2005, and August 1, 2005;
 c. Stipulated Exhibit 3 — "Job Site Analysis" form dated March 22, 2001 and e-mail correspondence dated October 14, 2004 from Mr. David Clawson to Ms. Susan Osgood, September 17, 2007 from Ms. Karla Santacapita, and October 31, 2007 from Mr. Bobby Burn to Ms. Susan Hammond;
 d. Stipulated Exhibit 4 — "Report of Employee Occupational Injury or Illness" forms dated February 5, 2001, June 30, 2003, and October 31, 2007;
 e. Stipulated Exhibit 5 — Plaintiff's performance reviews;
 f. Stipulated Exhibit 6 — North Carolina Industrial Commission forms and filings in I.C. file number 028886;
 g. Stipulated Exhibit 7 — Discovery responses in I.C. file number 028886;
 h. Stipulated Exhibit 8 — Plaintiff's medical records in I.C. file number 028886; *Page 4 
 i. Stipulated Exhibit 9 — "Criteria-Based Job Description and Performance Standards New Hanover Regional Medical Center" forms for Magnetic Resonance Imaging Technologist position dated July 22, 1993, January 24, 2005, and August 1, 2005 [duplicate];
 j. Stipulated Exhibit 10 — Plaintiff's personnel file;
 k. Stipulated Exhibit 11 — North Carolina Industrial Commission forms and filings in I.C. file numbers 418442, 886198, and 994533;
 l. Stipulated Exhibit 12 — Plaintiff's medical records in I.C. file numbers 418442, 886198, and 994533;
 m. Stipulated Exhibit 13 — Dubbed copy of video depicting an on-site evaluation of Plaintiff's employment duties by Ms. LeNeve Davenport Duncan;
 n. Stipulated Exhibit 14 — Copies of videos of Defendant's surveillance of an on-site evaluation of Plaintiff's employment duties by Ms. LeNeve Davenport Duncan;
 o. Stipulated Exhibit 15 — Copy of video depicting an on-site evaluation of Plaintiff's employment duties by Mr. Alex Stephen Arab;
 p. Stipulated Exhibit 16 — Plaintiff's workers' compensation claims payment histories for March 19, 2004 and August 20, 2007 work injuries.
 *********** ISSUE
The issue to be determined is whether Plaintiff contracted an occupational disease as a result of her employment duties with Defendant? *Page 5 
 ***********
Based upon the competent and credible evidence of record, as well as any reasonable inferences that may be drawn therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, Plaintiff was 59 years old, with a date of birth of January 24, 1951. Plaintiff has an associate's degree. In 1999, Plaintiff began working for Defendant as a magnetic resonance imaging (MRI) technologist and continued to work in that position as of the date of the hearing before the Deputy Commissioner. Plaintiff's position with Defendant requires that she rotate between three locations: the main hospital; Cape Fear Hospital; and the Medical Mall. At all of these work locations, there are typically two MRI technologists working at a time, with some instances of just one working if there is an understaffing situation. In addition, Plaintiff serves as an on-call MRI technologist four to six times per month at the Cape Fear Hospital location, and she volunteers to work extra hours or shifts when a co-worker is absent.
2. Plaintiff's duties in her position involve performing four to nine MRI scans per eight hour shift, depending on whether there is another MRI technologist on duty. For each patient, the MRI technologists are responsible for scanning paper documents and inputting data into Defendant's computer system, moving and instructing the patient, adjusting the coil for the body part to be scanned, and running the MRI scan using the computer keyboard and mouse. The MRI scan itself typically runs 35 to 45 minutes. When two MRI technologists are on duty, they share these responsibilities.
3. There are two separate work stations at each of Plaintiff's work locations — a work station used for ordering MRI studies, scanning paper documents, and inputting data into *Page 6 
Defendant's computer system, and a work station for running the actual MRI scan. The work station utilized for running the actual MRI scan has a large computer monitor, mouse, and keyboard. When Plaintiff is at the work station utilized for running the actual MRI scan, the process of administering the MRI requires that she constantly use both the computer mouse and keyboard in order to adjust certain parameters associated with the MRI scan. Individual MRI sequences can take anywhere from 16 seconds to several minutes.
4. Plaintiff reported numerous work-related injuries affecting different parts of her body during her work history with Defendant. However, it appears from the evidence that Plaintiff missed very few work days as a result of these workers' compensation claims.
5. In 2001, Plaintiff initially began having problems with her right shoulder and arm, which she reported to Defendant. On March 22, 2001, Mr. David Clawson, an occupational therapist employed by Defendant, performed an ergonomic assessment of Plaintiff's work stations at the main hospital and Medical Mall locations. Mr. Clawson found that Plaintiff's duties consisted of operating a computer 90 to 100 percent of the time, with the other 10 percent involving the transferring of patients. Additionally, Mr. Clawson noted that the configuration of the computer keyboard that Plaintiff used caused her to rest her forearms with no foam wrist rest. Mr. Clawson gave Plaintiff neck and shoulder stretches in order to help alleviate her complaints of tightness, and recommended that she obtain a foam or gel padded wrist rest to use with the computer and mouse. In response to Mr. Clawson's recommendations, Plaintiff received a wrist rest and keyboard tray that provided support for her arms.
6. On March 19, 2004, Plaintiff fell from a MRI mobile truck while working for Defendant and injured her right thumb, left shoulder, left wrist, and other body parts. Defendant accepted the compensability of Plaintiff's March 19, 2004 work injury (I.C. file number 418442) *Page 7 
via a Form 60 dated March 31, 2004. Plaintiff sought treatment from Dr. Richard Sulter Moore, Jr., an orthopaedist with a sub-specialty in hand surgery, and was out of work for only two to three weeks, after which she returned to light-duty work with Defendant screening patients via telephone.
7. In October 2004, Plaintiff experienced an increase in her right shoulder, neck, and arm pain, which she reported to Defendant. On October 13, 2004, Mr. Clawson again performed an ergonomic assessment of Plaintiff's work station at the main hospital. Mr. Clawson found that the height of the desktop combined with the face board under the desktop at Plaintiff's work station prevented her from sitting close enough to the desk, unless she lowered the chair. However, if Plaintiff lowered the chair, her elbows were too far below the desktop. In response to Mr. Clawson's recommendations, Defendant removed the drawer under the desktop. In addition, Plaintiff was able to test several new chairs over the next year, all without success. Defendant finally allowed Plaintiff to go to an office supply store and pick out her own chair.
8. In 2007, Plaintiff applied for and received a "permanent" work assignment at the Medical Mall location. In this new work assignment, Plaintiff would spend approximately 75 percent of her working hours at the Medical Mall location, and the remaining 25 percent of her working time rotating between the main hospital and the Cape Fear Hospital locations. This remained Plaintiff's work rotation as of the date of the hearing before the Deputy Commissioner.
9. On August 20, 2007, Plaintiff began working in this permanent position at the Medical Mall location. Shortly after beginning this permanent position, Plaintiff experienced right shoulder, trapezius, and arm pain, as well as bilateral hand numbness, cramping, and tingling, which she reported to Defendant. Plaintiff's pain would begin in the morning, increase throughout her workday, and awaken her several times at night. *Page 8 
10. On September 10, 2007, Ms. Karla Santacapita, an occupational therapist employed by Defendant, evaluated Plaintiff's work station at the Medical Mall location. Ms. Santacapita made the following recommendations: lower the height of desk area one approximately one and one-half inches in order to allow for the proper angle of the upper extremities to the keyboard and mouse; provide gel wrist rests for the keyboard and mouse; remove the drawers mounted under the desktop of desk area two; and either lower the height of desk area two approximately three to four inches or add a foot stool and adjustable-height chair with removable arm rests. Defendant accommodated some, but not all of these changes several months after Ms. Santacapita made her recommendations.
11. On October 18, 2007, Plaintiff returned to Dr. Moore, at which time she complained of bilateral hand pain, left greater than right, and bilateral hand numbness and tingling. Dr. Moore recommended that Plaintiff obtain a consultation with Dr. Patrick Thomas Boylan, a pain management specialist, and also recommended an ergonomic evaluation of her work station(s). Additionally, Dr. Moore completed a Form 18M in connection with Plaintiff's March 19, 2004 work injury where she fell from the MRI mobile truck. Dr. Moore indicated that Plaintiff was at risk for post-traumatic arthritis and may need future medical treatment.
12. On November 30, 2007, Plaintiff presented to Dr. Boylan with complaints of daily hand and wrist pain over the last year or more, and increasing numbness, especially along the radial-sided digits. In addition, Plaintiff described numbness on the ulnar distribution of the left hand and loss of grip strength. Plaintiff felt that her symptoms were more prominent at night. Dr. Boylan ordered nerve conduction studies, which revealed moderate bilateral median neuropathy at the wrist, consistent with moderate bilateral carpal tunnel syndrome, but no evidence of peripheral poly-neuropathy. As a result of these findings, Dr. Boylan ordered *Page 9 
conservative treatment including wrist splints to wear at night and use of over-the-counter pain medication. Plaintiff continued working for Defendant as a MRI technologist.
13. On February 7, 2008, Plaintiff returned to Dr. Moore. Dr. Moore concurred with the diagnosis of bilateral carpal tunnel syndrome, and discussed with Plaintiff the option of carpal tunnel injection therapy versus a limited open carpal tunnel release procedure. Plaintiff elected to proceed with the limited open carpal tunnel release procedure. Dr. Moore also amended the October 18, 2007 Form 18M indicating that Plaintiff developed bilateral post-traumatic carpal tunnel syndrome as a result of her March 19, 2004 work injury, and that she required surgery. Dr. Moore changed his opinion and testified that Plaintiff's March 19, 2004 work injury did not cause her bilateral carpal tunnel syndrome during his first deposition, when given more information concerning Plaintiff's employment duties.
14. On April 29, 2008, Plaintiff returned to Dr. Moore and informed him that she was now reluctant to proceed with the limited open carpal tunnel release procedure. Plaintiff opted to undergo carpal tunnel injection therapy, instead.
15. On May 27, 2008, Plaintiff reported relief of her carpal tunnel symptoms following her April 29, 2008 carpal tunnel injection to her left hand. Plaintiff elected to undergo a carpal tunnel injection to her right hand since it was now more symptomatic. Following the carpal tunnel injection to Plaintiff's right hand, she also reported improvement.
16. On July 29, 2008, Dr. Moore testified in connection with Plaintiff's March 19, 2004 work injury and opined that Plaintiff's March 19, 2004 work injury did not cause her bilateral carpal tunnel syndrome. At that time Dr. Moore was of the opinion that Plaintiff's employment duties as a MRI technologist with Defendant caused the carpal tunnel syndrome. *Page 10 
17. On November 24, 2008, Plaintiff returned to Dr. Moore's physician's assistant and reported a recurrence of carpal tunnel symptoms in both hands. Plaintiff received bilateral carpal tunnel injections with only temporary relief. On January 22, 2009, Plaintiff complained of an exacerbation of her carpal tunnel symptoms with increased activity. Dr. Moore was of the opinion that conservative treatment was no longer helping Plaintiff and recommended that she proceed with the limited open carpal tunnel release surgery.
18. On March 11, 2009, Plaintiff underwent bilateral carpal tunnel release surgery performed by Dr. Moore, which was successful. As of the date of the close of the record before the Deputy Commissioner, Dr. Moore had yet to release Plaintiff to return to work, and she was not at maximum medical improvement.
19. Ms. Debra Carter, Plaintiff's supervisor who has been working with her for the past 10 years, corroborated Plaintiff's testimony regarding the nature of her employment duties. According to Ms. Carter, Plaintiff's position required that she constantly use both the computer mouse and keyboard in order to adjust certain parameters associated with the MRI scan, and that for more than a year to a year and a half prior to the hearing before the Deputy Commissioner, Plaintiff worked numerous shifts by herself due to the loss of several MRI technologists, and Plaintiff complained to her that her hand pain increased throughout the workday. Ms. Carter also has carpal tunnel syndrome for which she wears wrist braces and has complaints of increasing pain when using the computer mouse at work.
20. Ms. Susan Britt, another MRI technologist who works with Plaintiff, also corroborated Plaintiff's testimony regarding the nature of her employment duties and her increased hand pain when using the computer keyboard and mouse. Ms. Britt also has carpal *Page 11 
tunnel syndrome. Although Ms. Britt also wears a brace while working, she also felt that using the computer mouse at work made her carpal tunnel symptoms worse.
21. On October 6, 2008, Mr. Alex Stephen Arab, a licensed physical therapist, athletic trainer, and an ergonomist, performed an on-site evaluation of Plaintiff's MRI technologist position at the Medical Mall location, and observed Plaintiff performing her employment duties for several hours. During Mr. Arab's evaluation, another MRI technologist was working with Plaintiff. Mr. Arab did not interrupt or alter Plaintiff's regular work activities, and he provided a video of his evaluation. Mr. Arab observed Plaintiff perform a number of movements throughout the day, including getting up from her chair and moving about intermittently, and using the computer keyboard and mouse. Mr. Arab concluded that Plaintiff's use of the computer keyboard and mouse were not highly repetitive activities, and that Plaintiff used her right hand to operate the mouse while her left hand was often at rest by her side, on the chair's armrest, or moving about as Plaintiff talked.
22. According to Mr. Arab, the primary causes of occupational carpal tunnel syndrome are repetition, force, sustained gripping, and sustained extreme wrist postures. However, Mr. Arab noted that he did not observe any of these factors in Plaintiff's position, and that because of the variety of tasks she performed, there was no sustained wrist posture. Mr. Arab further noted that he did not observe any sustained or contact pressure on Plaintiff's carpal tunnels, and that because Plaintiff was working at a desk and was free to move the computer keyboard and mouse to suit her comfort, her wrists, hands, and forearms did not have to assume any awkward positions.
23. Mr. Arab opined that he saw nothing in either his own evaluation of the Medical Mall location or his review of video from Plaintiff's other work locations that caused him *Page 12 
concern for the development of carpal tunnel syndrome, and he classified the risk for upper extremity cumulative trauma from Plaintiff's position as "very low," although he did agree that non-neutral wrist postures may be a risk factor for the development of carpal tunnel syndrome. Mr. Arab was of the opinion that Plaintiff's job did not place her at an increased risk over that of the general population for the development of carpal tunnel syndrome. However, Mr. Arab did not personally observe Plaintiff at her other work locations at which she spent 25 percent of her time, he could not say whether his video was an accurate or complete assessment of Plaintiff's employment duties, and he did not perform the rapid upper limb assessment or any other ergonomic tests in order to measure the posture, force, and muscle work for the upper extremities and cervical spine.
24. On November 28 and 29, 2008 and December 16, 2008, Ms. LeNeve Davenport Duncan, a licensed physical therapist who spends all of her time performing ergonomic evaluations, performed an on-site evaluation of Plaintiff's MRI technologist position at all of Plaintiff's work locations and observed Plaintiff performing her employment duties for several hours (approximately one hour, 45 minutes at the main hospital location, approximately one hour, 30 minutes at the Cape Fear Hospital location, and approximately one hour, 30 minutes at the Medical Mall locations.) During Ms. Duncan's evaluation, she made suggestions, asked questions, and made adjustments to Plaintiff's work station, including simulating the desk set-up at the Medical Mall location as it existed in August 2007, when Plaintiff initially began to experience symptoms of carpal tunnel syndrome. Ms. Duncan reviewed the September 10, 2007 report of Ms. Santacapita in order to assist her in simulating the desk set-up at the Medical Mall location as it existed in August 2007. Ms. Duncan also provided videos of her evaluation. *Page 13 
Along with Ms. Duncan's written report and videos, she also provided 10 photographs illustrating Plaintiff's wrist posture in performing her employment duties.
25. Ms. Duncan utilized the rapid upper limb assessment (RULA) in order to measure Plaintiff's posture, force, and muscle work for the upper extremities and cervical spine. Based upon the rapid upper limb assessment, all of Plaintiff's wrist postures were 30 to 50 degrees of wrist extension, which is a deviation from the preferred neutral position. Ms. Duncan explained that any time wrist extension varies from the neutral position, this causes increased pressure in the carpal tunnel, which will, in turn cause carpal tunnel inflammation and eventually carpal tunnel syndrome.
26. As a result of Ms. Duncan's observations of Plaintiff working at all of her work locations, she was of the opinion that Plaintiff had poor posture, contact pressure, and wrist extension causing her to rest her wrist superficial to the carpal tunnel and bear weight on it for support due to improper desk and chair height, unsuitable chairs, and either no or inadequate wrist support. Plaintiff's posture was especially poor at the main hospital and Cape Fear Hospital locations, where she worked 25 percent of the time. At the Medical Mall location as it existed in August 2007, the desk height, lack of wrist supports, and sharp desk edges caused extreme wrist extension, poor alignment of the shoulders and elbows, lack of forearm support, awkward wrist posture in an extended position, and contact pressure on the volar wrist.
27. Ms. Duncan opined that Plaintiff's MRI technologist position placed her at an increased risk for the development of carpal tunnel syndrome. According to Ms. Duncan, Plaintiff's duties caused significant stresses to the upper extremity, including wrist deviation, contact stress, and poor posture due to maintaining a static position in order to always be in a ready position to type or use the computer mouse. Ms. Duncan opined that Plaintiff's poor *Page 14 
posture and contact pressure increased her carpal tunnel pressure, eventually leading to the development of carpal tunnel syndrome, and that Plaintiff's contact pressure and upper extremity deviations at work put her at an increased risk for the development of carpal tunnel syndrome over that of the general population.
28. Since Mr. Arab's opinions concerning increased risk of Plaintiff's carpal tunnel syndrome appear to represent only a difference of opinion between experts, the Full Commission gives greater weight to the opinion testimony of Ms. Duncan than to any contrary opinions of Mr. Arab. Mr. Arab did not take into account the desk set-up of the Medical Mall location as it existed in August 2007, when Plaintiff initially began to experience symptoms of carpal tunnel syndrome. In addition, Mr. Arab did not personally observe Plaintiff at her other work locations at which she spent 25 percent of her time, and at which Ms. Duncan concluded that Plaintiff's posture was especially poor. Mr. Arab did not perform the rapid upper limb assessment or any other ergonomic tests in order to measure the posture, force, and muscle work for the upper extremities and cervical spine. Finally, unlike Mr. Arab, Ms. Duncan devotes a majority of her professional time to ergonomic analyses, and has 22 years of experience in this field.
29. At the request of Defendant, Dr. George Sadler Edwards, Jr., an orthopaedist with a sub-specialty in hand surgery, reviewed Plaintiff's medical and other records related to this matter, along with the videos of Mr. Arab and Ms. Duncan. Dr. Edwards did not meet with or personally examine Plaintiff. Dr. Edwards did not dispute Dr. Moore's diagnosis and treatment of Plaintiff's carpal tunnel syndrome. Dr. Edwards testified that he did not need to see Plaintiff in order to provide his expert opinions on increased risk and causation, as these opinions would be based upon his review of the evidence of record as to Plaintiff's employment duties and medical treatment. *Page 15 
30. Dr. Edwards opined that he saw no relationship between Plaintiff's employment duties and her development of carpal tunnel syndrome, and that he did not observe any significant contact pressure near Plaintiff's carpal tunnels while performing her duties. According to Dr. Edwards, Plaintiff's employment duties did not involve enough strain, force, or frequency of finger flexors in order to cause or contribute to her development of carpal tunnel syndrome and did not place her at an increased risk for the development of carpal tunnel syndrome over that of the general population. Dr. Edwards further opined that Plaintiff's employment duties did not aggravate her carpal tunnel syndrome. Rather, Dr. Edwards was of the opinion that it was more likely than not, given Plaintiff's age, gender, the bilateral nature of her carpal tunnel syndrome, her need for surgery, and the surgical findings, that her condition was idiopathic in nature.
31. Dr. Moore opined, to a reasonable degree of medical certainty, that Plaintiff's employment duties placed her at an increased risk for the development of the bilateral carpal tunnel syndrome that he treated. In addition, Dr. Moore opined, to a reasonable degree of medical certainty, that Plaintiff's employment duties more likely than not caused the development of the bilateral carpal tunnel syndrome that he treated. Dr. Moore based his opinions upon Plaintiff's presentation of complaints in October 2007 of bilateral hand numbness and tingling, her overall medical history, the November 30, 2007 nerve conductions studies, the September 10, 2007 ergonomic evaluation of Ms. Santacapita, and the subsequent ergonomic evaluations and videos of Mr. Arab and Ms. Duncan.
32. Although Dr. Moore agreed that Plaintiff was in a patient population at risk for the development of carpal tunnel syndrome by virtue of her age, gender, and the bilateral nature of her disease, he was of the opinion that Plaintiff's "occupational factors contributed more than *Page 16 
the general population." The most important occupational factors that Dr. Moore felt caused Plaintiff's bilateral carpal tunnel syndrome to develop were the sharp desk edges, desk heights, and difficulty positioning chairs at her work stations in order to maintain good posture, all of which made it difficult to position her wrists in an optimal manner, and thereby creating pressure on the wrists and carpal tunnels. This increased pressure on Plaintiff's wrists and carpal tunnels in turn created increased pressure on the surrounding nerves, which ultimately led to the development of her bilateral carpal tunnel syndrome.
33. The Full Commission gives greater weight to the opinion testimony of Dr. Moore over any contrary opinions of Dr. Edwards.
34. The Full Commission finds Plaintiff's testimony concerning the nature and extent of her bilateral hand/upper extremity pain and numbness since August 2007 to be credible.
35. The Full Commission finds, based upon the greater weight of the evidence, that Plaintiff's employment duties placed her at an increased risk for the development of her bilateral carpal tunnel syndrome, and that Plaintiff's employment duties more likely than not caused the development of her bilateral carpal tunnel syndrome.
36. The Full Commission finds, based upon the greater weight of the evidence, that Plaintiff has not reached maximum medical improvement with regard to her bilateral carpal tunnel syndrome, and that because Dr. Moore has not released Plaintiff to return to work following her surgery, she established temporary total disability from March 11, 2009 and continuing.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following: *Page 17 
 CONCLUSIONS OF LAW
1. In Rutledge v. Tultex Corp./King's Yarn, the Supreme Court of North Carolina held that in order for an occupational disease to be compensable under the North Carolina Workers' Compensation Act, a plaintiff must prove that the claimed disease is: "(1) characteristic of persons engaged in the particular trade or occupation in which the [plaintiff] is engaged; (2) not an ordinary disease of life to which the public generally is equally exposed with those engaged in that particular trade or occupation; and (3) there must be a causal connection between the disease and the [plaintiff's] employment." Rutledge v. Tultex Corp./King'sYarn, 308 N.C. 85, 93, 301 S.E.2d 359, 365 (1983). In cases where the employment exposed the worker to a greater risk of contracting the disease than the general public, the first two elements are satisfied. Rutledge, 308 N.C. at 93-94, 301 S.E.2d at 365.
2. Plaintiff has established by the greater weight of the evidence that as a result of her employment with Defendant-Employer she contracted bilateral carpal tunnel syndrome, an occupational disease. N.C. Gen. Stat. § 97-53(13) (2009). The opinion testimony of Dr. Richard Sulter Moore, Jr., to which the Full Commission has given greater weight over the contrary opinions of Dr. George Sadler Edwards, Jr., and the opinion testimony of Ms. LeNeve Davenport Duncan is sufficient to meet Plaintiff's burden of proving that her employment duties placed her at greater risk for contracting bilateral carpal tunnel syndrome, and that Plaintiff's employment duties, more likely than not, caused the development of her bilateral carpal tunnel syndrome. Rutledge,308 N.C. 85, 301 S.E.2d 359 (1993). Dr. Moore had sufficient facts concerning the nature of Plaintiff's employment duties from which to render competent opinions.
3. Plaintiff has presented competent expert medical testimony to prove her claim. Holley v. ACTS, Inc.,357 N.C. 228, 581 S.E.2d 750 (2003); Young v. HickoryBusiness *Page 18 Furniture, 353 N.C. 227, 538 S.E.2d 912 (2000).
4. As a result of Plaintiff's occupational disease of bilateral carpal tunnel syndrome, Dr. Moore removed her from work on March 11, 2009 due to her surgery and has not released her to return to work. Therefore, Plaintiff has established that she has been medically disabled and unable to earn wages in any employment from March 11, 2009, and continuing. Plaintiff is entitled to temporary total disability compensation at the rate of $754.00 per week from March 11, 2009 through the present and continuing until further order of the North Carolina Industrial Commission. N.C. Gen. Stat. § 97-29 (2009); Russell v. Lowes Prod.Distribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993).
5. As a result of Plaintiff's occupational disease of bilateral carpal tunnel syndrome, Plaintiff is entitled to have Defendant pay for all medical treatment reasonably related to her bilateral carpal tunnel syndrome, including, but not limited to the treatment recommended by Dr. Moore. N.C. Gen. Stat. §§ 97-2(19), 97-25 (2009).
6. Plaintiff is not at maximum medical improvement with respect to her occupational disease of bilateral carpal tunnel syndrome.
7. Dr. Moore is hereby designated as Plaintiff's authorized treating physician for the purpose of providing the future medical treatment Plaintiff requires for her occupational disease of bilateral carpal tunnel syndrome. N.C. Gen. Stat. § 97-25 (2009).
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission makes the following:
 AWARD *Page 19 
1. Subject to a reasonable attorney's fee herein approved, Defendant shall pay temporary total disability compensation to Plaintiff at the rate of $754.00 per week from March 11, 2009 and continuing until further order of the North Carolina Industrial Commission. The accrued compensation shall be paid in a lump sum.
2. Defendant shall pay all medical expenses incurred or to be incurred as a result of Plaintiff's occupational disease of bilateral carpal tunnel syndrome, for so long as such evaluations, examinations, and treatments may reasonably be required to effect a cure, to give relief, and/or to lessen her period of disability, in accordance with the provisions of the North Carolina Workers' Compensation Act.
3. Dr. Richard Sulter Moore, Jr. is hereby designated as Plaintiff's authorized treating physician, and Defendant shall authorize and pay for the treatment that he provides for Plaintiff's occupational disease of bilateral carpal tunnel syndrome, including, but not limited to any and all medical treatment which may reasonably be required to effect a cure, to give relief, and/or to lessen her period of disability.
4. A reasonable attorney's fee of 25 percent is hereby approved for Plaintiff's counsel from the sums due Plaintiff under paragraph one (1), above. Defendant shall deduct and pay directly to Plaintiff's counsel 25 percent of the accrued compensation owed to Plaintiff and every fourth compensation check thereafter.
5. Defendant shall pay the costs of these proceedings, including, but not limited to, any unpaid expert witness fees.
6. Pursuant to Rule 7(c) of the Rules for Mediated Settlement and Neutral Evaluation Conferences of the North Carolina Industrial Commission, Plaintiff shall reimburse to Defendant half of the mediation fee in this matter. *Page 20 
This the __ day of April 2010.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/___________________ STACI T. MEYER COMMISSIONER *Page 1